## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADAM FRANCHI, derivatively on behalf of CENTENE CORPORATION, | Case No. |
| Plaintiffs, | |
| v. | |
| SARAH M. LONDON, JESSICA L. BLUME, KENNETH A. BURDICK, CHRISTOPHER J. COUGHLIN, H. JAMES DALLAS, WAYNE S. DEVEYDT, FREDERICK H. EPPINGER, MONTE E. FORD, THOMAS R. GRECO, LORI J. ROBINSON, THEODORE R. SAMUELS, KENNETH Y. TANJI, and ANDREW L. ASHER, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| | |
| Defendants, | **JURY TRIAL DEMANDED** |
| -and- | |
| CENTENE CORPORATION, | |
| Nominal Defendant. | |

Plaintiff Adam Franchi ("Plaintiff"), derivatively on behalf of Centene Corporation ("Centene" or the "Company"), brings the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiff and Plaintiff's own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *Lunstrum v. Centene Corporation, et al.*, Case No. 1:25-cv-05659 (S.D.N.Y.) (the "Securities Action"); (iii) corporate governance documents available on the Company's website; (iv) media reports; and (v) other publicly

available information.

## **NATURE OF THE ACTION**

1.      This is a stockholder derivative action brought by Plaintiff, a stockholder of Centene, on behalf of the Company against the Defendants.  This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least December 12, 2024, to June 30, 2025 (the "Relevant Time Period"). During that time the Defendants (as defined herein) caused or allowed Centene to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2.      Throughout the Relevant Time Period, Centene and its executive officers created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also touting enrollment rates and low morbidity. In press releases, presentations, and calls with analysts and investors, the Company and its executive officers made overwhelmingly positive statements about Centene's expected revenue and adjusted diluted EPS for fiscal year 2025. These statements included, among other things, confidence in the Company's enrollment and morbidity rates, as well as strong retention rates in Centene's Medicare business.

3.      These statements proved to be false when, on July 1, 2025, Centene issued a press release withdrawing its guidance for 2025. Particularly, after an analysis of the health insurance marketplace, Centene's overall market growth across 22 states, or 72% of the Company's marketplace membership, was lower than expected. Investors and analysts reacted immediately to Centene's revelation, and Centene's common stock dropped more than 40% in one day.

4. Through this action, Plaintiffs seek to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements in breach of their fiduciary duties to the Company.

## PARTIES

### A. Plaintiff

5. Plaintiff is a current shareholder of Centene and has continuously held Centene stock during all times relevant hereto and is committed to retaining Centene shares through the pendency of this action to preserve his standing. Plaintiff will adequately and fairly represent the interests of Centene and its shareholders in enforcing its rights.

### B. Nominal Defendant

6. Nominal Defendant Centene is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 7700 Forsyth Boulevard, St. Louis, Missouri 63105. Centene common stock trades on the New York Stock Exchange (the "NYSE") under the symbol "CNC."

### C. Individual Defendants

7. Defendant Sarah M. London has served as the CEO of the Company since 2022 and as a director of the Company since 2021.

8. Defendant Jessica L. Blume has served as a director of the Company since 2018.

9. Defendant Kenneth A. Burdick has served as a director of the Company since 2022.

10. Defendant Christopher J. Coughlin has served as a director of the Company since 2022.

11. Defendant H. James Dallas has served as a director of the Company since 2020.

12. Defendant Wayne S. DeVeydt has served as a director of the Company since 2022.

13.     Defendant Frederick H. Eppinger has served as a director of the Company since 2006.

14.     Defendant Monte E. Ford has served as a director of the Company since 2022.

15.     Defendant Thomas R. Greco has served as a director of the Company since 2024.

16.     Defendant Lori J. Robinson has served as a director of the Company from 2019 until May 13, 2025.

17.     Defendant Theodore R. Samuels has served as a director of the Company since 2022.

18.     Defendant Kenneth Y. Tanji has served as a director of the Company since February 2025.

19.     Defendant Andrew L. Asher, has served as the CFO of the Company since 2021.

20.     Defendants London, Eppinger, Blume, Burdick, Coughlin, Dallas, DeVeydt, Ford, Greco, Robinson, Samuels, and Tanji are herein referred to as the "Director Defendants."

21.     Defendants London and Asher are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

23.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as

to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

25.    Venue is proper in this court under 28 U.S.C. § 1391, because Centene is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

### FURTHER SUBSTANTIVE ALLEGATIONS

**A.    Company Background**

26.    Centene provides health care plans through Medicare, Medicaid, and health insurance marketplaces, as well as dental, vision, and pharmacy plans. The Company also has a clinical care company, Community Medical Group, and a behavioral health services company, Magellan Health. The Company operates through four segments: Medicaid, Medicare, Commercial (which includes health insurance marketplaces), and Other. In 2024, the Medicare and Commercial segments accounted for 14% and 21% of the Company's external revenues, respectively.

**B.    Centene's False and Misleading Statements**

27.    From at least December 12, 2024, through June 30, 2025 (the "Relevant Time Period"), Centene and its executive officers created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth while also touting enrollment rates and low morbidity.  In truth, Centene's optimistic reports and promises regarding the Company's inflated guidance fell short of reality when a preliminary analysis of over two thirds of Centene's health insurance marketplace share showed lower-than-anticipated enrollment and increased aggregate market morbidity.

28.    On December 12, 2024, Centene filed a Form 8-K with the SEC, attaching a press release the Company had issued announcing 2025 guidance. The press release Defendant London as stating:

> Centene is a mission-driven organization, dedicated to delivering high quality outcomes for more than 28 million members, many of whom are among the nation's most medically complex and historically underserved populations. Over the last three years we improved our core operations and invested in the experience of our customers and providers, all while delivering on our financial commitments. . . . This morning, we are reiterating our 2024 adjusted diluted EPS guidance of greater than $6.80. Additionally, we issued 2025 adjusted diluted EPS guidance of greater than $7.25, representing more than 6% year-over-year growth.

29.    That day, Centene hosted a virtual investor meeting. The presentation provided to investors for that meeting included the following slide on projected revenues for 2025:



30.     The presentation also included a slide outlining the Company's plan for long-term growth:



31.     During the investor meeting, Defendant Asher stated, in relevant part:

Let's start with the basics. Stability in earnings power in the face of unprecedented headwinds provide Centene with a solid jump off point for 2025 and beyond. As you've likely seen by now, we've issued 2025 adjusted EPS guidance of greater than $7.25, representing more than 6% year-over-year growth compared to this year's current outlook. We are using today as an opportunity to set the floor for 2025 guidance, inclusive of an expectation for a 3% to 4% Medicaid composite rate adjustment.

\*     \*     \*

Now let's move to why you joined us today: the future. Starting with the first ingredient you need to drive earnings growth: revenue growth. We are expecting 7.6% growth at the midpoints, $11 billion of additional premium revenue compared to 2024 for a 2025 guidance midpoint of $155 billion of premium and service revenue.

\*     \*     \*

What does all of this add up to? Initial 2025 adjusted diluted EPS guidance of greater than $7.25. You can see 2025 guidance elements summarized here,

including our first year with a diluted share count starting with a 4. Note also an adjusted effective tax rate of 22% to 23%, which is down a little from 2024, primarily driven by a state tax benefit expected to be realized in Q4 of 2025.

32.    On February 4, 2025, Centene issued a press release releasing financial results for the fourth quarter and full year 2024. For the full year, the Company announced total revenues of $163 billion and premium and service revenues of $145 billion. In particular, revenues from the Commercial segment increased 36% between 2023 and 2024. The Company pointed to membership growth in the health insurance marketplace business for the growth in premium and service revenues for 2024. In addition, the press release disclosed that the Company was increasing its previously issued guidance:

**Outlook**

The Company is increasing its 2025 premium and service revenues guidance range by $4.0 billion to a range of $158.0 billion to $160.0 billion to reflect the following expectations:

- outperformance in our PDP annual enrollment resulting in an additional $1.5 billion premium revenue,
- outperformance in our Medicare Advantage annual enrollment resulting in $1.0 billion of additional premium revenue, and
- $1.5 billion of additional Medicaid premium revenue due to a program change adding behavioral health coverage in one of our state contracts.

The Company reiterates its 2025 GAAP diluted EPS guidance floor of greater than $6.19 and its 2025 adjusted diluted EPS guidance floor of greater than $7.25.

33.    The same day, Centene held a conference call with investors and analysts to discuss the financial results released that day. During that call Defendant London stated, in relevant part:

Strong results that demonstrate the durability of our earnings power and position the company to execute against our strategic goals in 2025. Driven by better-than-expected results during the Medicare annual enrollment period and a program expansion in Medicaid, we are lifting our full year 2025 revenue guidance by $4 billion.

Our outlook for full year 2025 adjusted diluted EPS remains unchanged at greater than $7.25, and we are pleased with the trajectory we are on at this early stage in

the year. To that end, let's talk about the opportunities in each of our business lines and how we are positioned for 2025.

34.    Defendant Asher reaffirmed the increased guidance for 2025 in the same call:

So we are increasing our consolidated 2025 premium and service revenue guidance range by $4 billion to a range of $158 billion to $160 billion of premium and service revenue. This is good news as you think about the long-term earnings power of Centene. At this very early point in the year, we are reiterating our 2025 adjusted diluted EPS guidance floor of greater than $7.25. Quick comment on 2026 Medicare rates. The preliminary percentage rate change for us is in the low to mid3s, including the positive impact of STARS from the work we did in 2023 and 2024.

35.    On April 25, 2025, Centene issued a press release announcing financial results for the first quarter 2025. Total revenues for the quarter were $46.6 billion, while premium and service revenues were $42.4 billion. The growth in premium and service revenues were attributed, in part, to overall market growth in the health insurance marketplace business. Defendant London was quoted as stating:

Our first quarter results demonstrate the resiliency of Centene's platform and the progress we are making as an organization while navigating a dynamic policy landscape. We are pleased to reiterate our full year 2025 adjusted diluted earnings per share outlook of greater than $7.25 and continue to see attractive opportunities to grow from the strength of our core businesses in the years to come.

36.    The press release also included updated guidance for fiscal year 2025:

**Outlook**

The Company is increasing its 2025 premium and service revenues guidance range by $6.0 billion to a range of $164.0 billion to $166.0 billion to reflect the following expectations:

- $5.0 billion of additional Marketplace premium revenue due to outperformance in enrollment throughout the first quarter; and

- outperformance in the Medicare Advantage annual enrollment period resulting in $1.0 billion of additional premium revenue.

The Company reiterates its 2025 GAAP diluted EPS guidance floor of greater than $6.19 and its 2025 adjusted diluted EPS guidance floor of greater than $7.25.

The Company's annual guidance for 2025 is as follows and will be discussed further on our conference call:

|  | Full Year 2025 |
|---|---|
| GAAP diluted EPS | > $6.19 |
| Adjusted diluted EPS (1) | > $7.25 |

(1) A full reconciliation of adjusted diluted EPS is shown in the Non-GAAP Financial Presentation section of this release.

|  | Full Year 2025 | | | |
|---|---|---|---|---|
|  | Low | | High | |
| Total revenues (in billions) | $ | 178.5 | $ | 181.5 |
| Premium and service revenues (in billions) | $ | 164.0 | $ | 166.0 |
| HBR | | 88.9 % | | 89.5 % |
| SG&A expense ratio | | 7.7 % | | 8.2 % |
| Adjusted SG&A expense ratio (2) | | 7.7 % | | 8.2 % |
| Cost of services expense ratio | | 88.2 % | | 88.8 % |
| Effective tax rate | | 21.5 % | | 22.5 % |
| Adjusted effective tax rate (3) | | 22.0 % | | 23.0 % |
| Diluted shares outstanding (in millions) | | 491.0 | | 494.0 |

(2) Represents a non-GAAP financial measure. Adjusted SG&A expense ratio excludes acquisition and divestiture related expenses of approximately $550 thousand.

(3) Represents a non-GAAP financial measure. Adjusted effective tax rate excludes income tax effects of adjustments of approximately $165 million to $168 million.

37.    Later that same day, Centene hosted a conference call with investors and analysts to discuss the Company's first quarter 2025 financial results. During the call Defendant Asher stated:

> On our entire Medicaid book, we are projecting a full year composite rate increase at 4% plus.
>
> Medicare Advantage and PDP both outperformed on membership. We retained more membership than expected during the Medicare Advantage open enrollment period, which bodes well for long-term earnings power. This is contributing $1 billion to our 2025 premium and service revenue guidance increase. PDP ended the quarter at 7.9 million members, strong growth from 2024.
>
> Medicare segment HBR was 86.3% in the quarter, which, as we covered in past discussions, is expected to follow an inverted slope line compared to 2024 due to the Inflation Reduction Act program changes. So a lower Medicare segment HBR and higher earnings early in the year and a higher HBR and lower earnings later in the year.
>
> Within the Medicare segment, both Medicare Advantage and PDP businesses were on track in the quarter. And you'll see an intra-year increase in the Medicare Advantage PDR, premium deficiency reserve, that was planned for and is solely related to the sloping of earnings during 2025. So no change in our view of Medicare Advantage earnings for 2025. Commercial membership was very strong in the quarter, not just during open enrollment for 1/1, but also in February and March. Q1
>
> Commercial segment HBR at 75.0% was a little higher than last year's 73.3%, driven by 1.9 million new Marketplace Members in Q1. These members are utilizing a little more than last year's new members. But because it's so early in the year, we are not yet recognizing a matching offset for risk adjustment. We'll know more when we get the first Wakely file in late June, early July.
>
> Given top line performance in Q1, and even as we forecast net membership attrition throughout the rest of the year, we are adding $5 billion of premium revenue to 2025 guidance related to Marketplace.
>
> \*        \*        \*
>
> Looking at the full year, we are pleased to reiterate greater than $7.25 of adjusted diluted EPS. As you've heard, the theme of the quarter was strong premium revenue growth and stronger-than-expected membership. Accordingly, we are increasing premium and service revenue guidance to a midpoint of $165 billion, up from $159 billion.

38.     During the question-and-answer segment of the conference call, Defendants London and Asher fielded questions from analysts, in relevant part:

<Q: Ann Kathleen Hynes - Mizuho Securities USA LLC – Analyst> I know you gave original guidance from Medicaid rates in the second half. You assumed, I believe, around the 2.5% rate increase. Is that still the case? And do you have increased visibility on how those negotiations are going for the second half? That would be my first question.

And then maybe secondly, with Medicaid besides the flu, is anything running harder than you expected when you -- versus when you gave original guidance?

<A: Defendant Asher> Thanks, Ann, for the question. So composite rate for the full year, we're now seeing at mid-4s, and the rate negotiations relative to upcoming, so think about the 7/1 cohort, which is the next cycle, we will start to get visibility into that as we get in -- later into Q2. So more to come on that front. But as you heard me say, I think we're seeing good continued momentum in our discussions with state partners. And the fact that as we roll forward, we have further completion data behind us in terms of the acuity patterns that started to emerge in Q2 right around this time last year. So that helps bolster the conversation in terms of supporting the actuarial calculus, and I think helps in conversations with the state. So obviously, looking to that 7/1, 9/1 and 10/1 cohort to contribute to the back half of the year. And then I think you asked about Medicaid utilization beyond flu. And so we continue to see largely the same themes. But Drew, maybe you want to click into a few of those. Yes. No, clearly, we had the flow of $130 million in Q1. That's transitory. Behavioral health continues to be a trend item. We've mentioned that probably for the last 6 quarters. We've got initiatives to tackle that and working with our state partners, things like applied behavioral analysis. I guess, no surprise coming out of the pandemic era. There's pockets of home health. We've mentioned that before, things like attended services that where we can tighten UM, do some audits. And then probably the area of uptick is high-cost drugs. An example might be Elevidys, which curiously is a $3.2 million single-treatment drug that if you read the JAMA articles, it's questionable in terms of the efficacy. And looking at -- we're all trying to keep health care affordable. That seems quite extreme for a cost of a single treatment for a newly approved drug last year. So that's an area of uptick that effectively is on the back of the federal and state governments and us as a payer.

So that's one thing we're watching, and we thought about that as we lifted the Medicaid HBR into the mid- to high 90-ones from our previous guidance.

*      *      *

<Q: Hua Ha – Robert W. Baird & Co. – Analyst> Regarding the exchanges. So firstly, I'm having a little bit of trouble bridging to your expected $5 billion of

additional revenue. If I take your roughly 0.5 million more lives, 550 revenue PMPM, I'm still getting to only about $3 billion to $4 billion. And I know you're still assuming the same in your attrition cadence. So I was wondering if you could help me bridge that gap in case I'm missing something. And then I understand you're treating incremental exchange growth in 1Q to be lower margins. It sounds like you could be conservatism, but wondering what exact margin level you're assuming on those lives. And lastly, very quickly, when you hear the most bearish concerns about the magnitude of potentially millions of fraudulent lives and the exchanges and the risk that might pose to you next year. I'm just curious to hear your general thoughts overall level of confidence that this most bear-case scenario that's rolling around won't actually happen.

<A: Defendant London> Yes. Thanks for the question. So let me start with the last piece of that and we can sort of work our way backwards. There's obviously been a lot of concern about the idea that there is sort of ramp in broker fraud or ghost members in the population, I think it's important to note that the movement to drive additional program integrity, which was understandably loosened during the pandemic, started more than a year ago and a lot of the program integrity measures that are being put in place are things that we've operated with in the past, which means we have baseline and benchmark data around what some of these rates should be.

We were a pioneer in terms of implementing the agent of record lock. Back in January of last year we introduced that. We were the first to put it in place. And we're seeing the benefit of that. And we track very closely the levels of complaints that come in from members or where there are broker issues throughout the year and can understand whether we're seeing upticks in that and anything different than what we would expect.

So I think we have accounted for things like the failure to reconcile in our full year outlook. Again, the timing of that has shifted. But the team is pretty experienced at understanding the dynamics in the membership. Obviously, the new utilizers that we have where we're seeing utilization is frankly a good sign because it's hard for ghosts to utilize the system. And we feel like we have all the data we need to account for what -- how this will play out both through the remainder of this year and in 2026.

I think you asked about sort of the level of margin for the new member cohort. Overall, we still expect to be in the 5% to 7.5% margin range for Marketplace. And as I said, we've encountered for a continuation of the level of utilization we're seeing in that new member base. In the full year outlook, our renewal members are as expected.

And then…

<A: Defendant Asher> Yes, then on your first question, the -- so we put up $10.1 billion of commercial premium in Q1. And if you do the math on our guidance, it's $39 billion for the full year. So we are accounting for attrition throughout the rest of the year to end up in the high 4s. So that sort of hangs together.

39.     The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose the true state of the Company's enrollment and morbidity rates, as well as retention rates in Centene's Medicare business, which were not as positive as the Company falsely represented.

   **C.     The Truth is Revealed**

40.     On July 1, 2025, Defendants issued a press release withdrawing the Company's previous 2025 GAAP and adjusted diluted earnings per share (EPS) guidance. The press release stated, in pertinent part:

**Marketplace 2025 Risk Adjustment Update**

The Company recently received and analyzed its first view of 2025 industry Health Insurance Marketplace (Marketplace) data from Wakely, an independent actuarial firm, covering 22 of Centene's 29 Marketplace states, and representing approximately 72% of the Company's Marketplace membership. This data is submitted to Wakely by most Marketplace insurance carriers.

Based upon the Company's preliminary interpretation of the data and discussions with Wakely, the overall market growth in the 22 states is lower than expected and the implied aggregate market morbidity in those states is significantly higher than, and materially inconsistent with, the Company's assumptions for risk adjustment revenue transfer used in the preparation of its previous 2025 consolidated guidance.

The Company's preliminary analysis of the 22 states results in a reduction to its previous full year net risk adjustment revenue transfer expectation by a preliminary estimate of approximately $1.8 billion which corresponds to an adjusted diluted EPS impact of approximately $2.75. This preliminary estimate includes a projection of the remaining eight months of 2025 and is based on 2025 paid claims through April 30 from Wakely for the 22 states, as well as the Company's membership estimates and morbidity trend estimates for both its members and the aggregate market, calculated by state.

The Company does not have information or estimates for its remaining seven Marketplace states, but anticipates, due to the morbidity trends observed in the 22 states, an additional reduction to its net risk adjustment revenue transfer expectation with a corresponding adjusted diluted EPS impact.

Regarding the 2026 Marketplace plan year, the Company has commenced the process of refiling 2026 Marketplace rates to reflect a higher projected baseline of Marketplace morbidity than previously expected. The Company currently expects to be able to take corrective pricing actions for 2026 in states representing a substantial majority of its Marketplace membership.

41.     The market reacted swiftly to this news. Centene's common stock plummeted from a closing market price of $56.65 per share on July 1, 2025, to $33.78 per share on July 2, 2025, a decline of 40.4%.

**D.      Defendants' Misconduct Has and Continues to Harm the Company**

42.     As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the Securities Action, as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

43.     Centene's reputation and goodwill have also been damaged by the Defendants' misconduct. A number of well-known analysts who had been following Centene lowered their price targets in response to Centene's disclosures. For example, on July 2, 2025, Barclays decreased its price target for Centene 31%.

44.     Similarly, CFRA, while considerably reducing their price target from $48 to $37, stated:

We cut our 2025 EPS view to $4.55 from $7.30 and keep 2026's at $7.91. CNC withdrew its 2025 guidance after reviewing new actuarial data that covers ~72% of CNC's Marketplace membership across 22 states. Centene now expects overall market growth to be lower and implied aggregate market morbidity in these states is significantly higher than CNC's assumptions for risk adjustment revenue transfer used in its previous guidance. From these 22 states, CNC sees a disconnect of $1.8B, which corresponds to an adj. EPS impact of $2.75. We note CNC has a

marketplace business in 29 states total, and anticipate the remaining seven states will show similar morbidity trends. This could reduce CNC's net risk adjustment revenue transfer expectations, and therefore EPS expectations, further.

45.    Guggenheim published a report calling Centene's news a "tough update," casting

doubt on the actions surrounding the reason for the original guidance:

> Centene withdrew its 2025 guidance following a material anticipated HIX risk adjustment revenue shortfall and higher Medicaid cost trend, although favorable MA/PDP performance and likely SG&A cuts partially offset. Our back-of-the envelope math suggests a $2.50-$3.00 EPS range for 2025 now (vs. previous guidance $7.25+), contemplating estimated negative impacts of ~$3.80 from HIX risk adjustment and ~ $1.50-$2.00 from Medicaid trend, perhaps offset by a favorable $1+ on MA/PDP upside and SG&A savings. For HIX, CNC noted an ability to potentially partially offset for the vast majority of its HIX book in 2026 via increased pricing, although rate request data we've analyzed so far suggests CNC had already requested mid-to-high teens rate growth for 2026 prior to yesterday's announcement. At issue, however, is how low CNC undershot its risk transfer position vs. competitors, and if this was simply a CNC mismodeling issue or if acuity is significantly higher across the rest of CNC's markets, which could have negative read-throughs to MOH, ELV, and CI in our coverage given relative HIX footprints. Nonetheless, combined with major market exits from competitors, and a lack of enhanced HIX subsidy extension already putting pressure on HIX risk pools, the announcement underpins even greater uncertainty around the HIX market for 2026. Additionally, continued cost trend pressures in Medicaid (already flagged by ELV) paint a difficult picture for near-term Medicaid earnings without absolute guarantees that actuarial sound rate catch-ups across states could be obtained in a timely manner. While better-than-expected performance in MA and PDP may provide some offsets, and CNC can look to reprice its HIX book in 2026, the updates leave us incrementally cloudy on the 2026 set-up. Despite a historically low valuation (~6.7x our current 2026E EPS), we are not surprised to see the stock trading down significantly (20%+) post-market on the updates. Maintain NEUTRAL rating.

### E.    Centene Issues False and Misleading Proxy Statements

46.    In addition to the false and misleading statements discussed above, the Director

Defendants also caused the Company to issue a false and misleading proxy statement during the

Relevant Time Period, specifically the Schedule 14A Proxy Statement issued on March 27, 2025

(the "2025 Proxy"), that sought stockholder votes to, among other things, re-elect Defendants

London, Eppinger, Blume, Burdick, Coughlin, Dallas, DeVeydt, Ford, Greco, Samuels, and Tanji to serve on the Board.

47.     Defendants London, Eppinger, Blume, Burdick, Coughlin, Dallas, DeVeydt, Ford, Greco, Samuels, and Tanji drafted, approved, reviewed, and/or signed the 2025 Proxy before it was filed with the SEC and disseminated to Centene's stockholders. Defendants London, Eppinger, Blume, Burdick, Coughlin, Dallas, DeVeydt, Ford, Greco, Samuels, and Tanji negligently issued materially misleading statements in the 2025 Proxy. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of Defendants London, Eppinger, Blume, Burdick, Coughlin, Dallas, DeVeydt, Ford, Greco, Samuels, and Tanji and they do not allege or do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the 2025 Proxy allegations and related claims.

48.     In support of re-electing themselves, Defendants London, Eppinger, Blume, Burdick, Coughlin, Dallas, DeVeydt, Ford, Greco, Samuels, and Tanji highlighted their supposed oversight of the Company in the 2025 Proxy. The 2025 Proxy stated:

**Risk Oversight**

The Board has overall responsibility for the oversight of enterprise-wide risk management at Centene, while management is responsible for day-to-day risk management. The Board implements its risk oversight function both as a whole and through its committees. Each Board committee oversees risks associated with its respective principal areas of focus and then reports to the Board. These areas of focus include competitive, economic, operational, financial (including accounting, credit, liquidity and tax), legal, regulatory, compliance, political, strategic, reputational and other risks.

The oversight responsibility of the Board and its committees is assisted by management reporting processes designed to provide visibility to the Board of the identification, assessment, prioritization and management of critical risks and management's risk mitigation strategies. The Company's process for the evaluation of risk is based on a blend of principles associated with the Committee of Sponsoring Organizations of the Treadway Commission (COSO) enterprise risk

management framework, Enterprise Risk Management – Integrating with Strategy and Performance and ISO 31000: 2018 Risk Management. The primary goals of the enterprise risk management program are to enhance management's ability to identify and assess the Company's current risk status, gain insights on emerging risks, improve management's strategic and operational decision-making ability and provide clear and timely communication of cross-functional risks to management and the Board. The enterprise risk management process is facilitated by the Company's Risk Management department. An enterprise risk management committee comprised of senior leaders within the Company meets at least four times per year to discuss the most significant risks to the Company identified by the Company's enterprise risk management process and the steps management has taken to identify, monitor, assess and control or avoid such exposures. The enterprise risk management committee also reviews performance measures against the company's risk appetite and tolerance and provides recommendation(s) of corrective action, where appropriate. The enterprise risk management process is an active process and is continually enhanced and updated.

The Company's Risk Management department provides an enterprise risk management report to the full Board at least four times per year. Each Board committee reports to the Board any significant issues relating to their relevant risk areas.

49.     The 2025 Proxy thus assured stockholders that Defendants London, Eppinger, Blume, Burdick, Coughlin, Dallas, DeVeydt, Ford, Greco, Samuels, and Tanji understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, Defendants London, Eppinger, Blume, Burdick, Coughlin, Dallas, DeVeydt, Ford, Greco, Samuels, and Tanji were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning the true state of the Company's enrollment and morbidity rates, as well as retention rates in Centene's Medicare business, which were not as positive as the Company falsely represented.

50.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect Defendants London, Eppinger, Blume, Burdick, Coughlin, Dallas, DeVeydt, Ford, Greco, Samuels, and Tanji to the Board.

**F.     The Board Breached its Fiduciary Duties**

51.     As officers and/or directors of Centene, the Defendants owed Centene fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Centene in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Centene, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

52.     Defendants, because of their positions of control and authority as directors and/or officers of Centene, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Centene's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

53.     To discharge their duties, the officers and directors of Centene were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Centene were required to, among other things:

> (a)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b)    Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d)    Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f)    Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g)    Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

54.    The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

55.    The Board's Audit Committee is tasked with overseeing Centene's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Centene's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include, as follows:

<u>Review of Other Financial Disclosures.</u>

    a.   *Quarterly Financial Statements*. The Committee shall meet to review and discuss with the Company's management and independent auditor the Company's quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." The independent auditor shall discuss promptly with the Committee and the Chief Financial Officer any matters identified in connection with the independent auditor's review of quarterly financial information which are required to be discussed by applicable auditing standards.

    b.   *Earnings Release and Other Financial Information*. The Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information, as well as financial information and earnings guidance provided to analysts, rating agencies and others.

<u>Controls and Procedures.</u>

    a.   *Oversight*. The Committee shall, in conjunction with the Chief Executive Officer and Chief Financial Officer of the Company, coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures.

56.     In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Blume, Coughlin, Dallas, DeVeydt, and Tanji conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. Defendants Blume, Coughlin, Dallas, DeVeydt, and Tanji's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

57.     In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

58.     The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Centene.

## DERIVATIVE ALLEGATIONS

59.     Plaintiff brings this action derivatively in the right and for the benefit of Centene to redress injuries suffered by Centene as a direct result of the Director Defendants' breaches of

fiduciary duty. Centene is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

60.     Plaintiff will adequately and fairly represent the interests of Centene in enforcing and prosecuting the Company's rights.

61.     Plaintiff was a stockholder of Centene at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is currently a Centene stockholder.

## DEMAND FUTILITY ALLEGATIONS

62.     Plaintiff repeats, re-alleges, and incorporates by reference each and every allegations set forth as though fully set forth herein.

63.     The Centene Board currently has eleven members: Defendants Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, London, Samuels, and Tanji.

64.     Plaintiff has not made any demand on Centene's current Board to institute this action against Defendants Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, London, Samuels, and Tanji, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

65.     Defendants Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, London, Samuels, and Tanji had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, Defendants Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, London, Samuels, and Tanji owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were

being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

66.     Defendants Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, London, Samuels, and Tanji's making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Centene. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in Defendants Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, London, Samuels, and Tanji facing a substantial likelihood of liability. Defendants Blume, Burdick, Coughlin, Dallas, DeVeydt, Eppinger, Ford, Greco, London, Samuels, and Tanji could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

### A.     Demand is Excused as to Defendant London

67.     Defendant London is the Company's CEO. Defendant London received compensation of $20.6 million in 2024. Defendant London depends on Centene for her income. In addition, Centene stated in the Schedule 14A Proxy Statement filed with the SEC on March 27, 2025 (the "2025 Proxy") that Defendant London is not independent pursuant to NYSE rules.

68.     Defendant London served as a director of the Company during the Relevant Time Period. As a director, Defendant London had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant London was also

required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

69.    Defendant London failed to conduct oversight of the Company's internal controls over financial reporting, London, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Centene's controls, Defendant London failed to protect corporate assets.

70.    Finally, Defendant London is a named defendant in the Securities Class Action. Thus, Defendant London faces a substantial likelihood of liability.

**B.    Demand is Excused as to Defendant Blume**

71.    Defendant Blume served as a director of the Company during the Relevant Time Period. As a director, Defendant Blume had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Blume was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

72.    Defendant Blume failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Centene's controls, Defendant Blume failed to protect corporate assets.

73.    According to the 2025 Proxy, Defendant Blume received $369,969 in compensation in connection with her role as a Company director. Defendant Blume is not otherwise employed. Accordingly, Defendant Blume cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

74.     Defendant Blume served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing financial information and earnings guidance provided to investors and analysts, as well as earnings press releases. The Audit Committee was thus responsible for reviewing the press releases issued during the Relevant Time Period. Defendant Blume was thus responsible for knowingly or recklessly allowing the improper statements related to the true state of the Company's enrollment and morbidity rates, as well as retention rates in Centene's Medicare business, which were not as positive as the Company falsely represented.

### C.     Demand is Excused as to Defendant Burdick

75.     Defendant Burdick served as the Executive Vice President of Centene from 2020 to 2021, and served as the CEO of WellCare Health Plans, Inc., from 2015 until its acquisition by Centene in 2020. Centene stated in the 2025 Proxy that Defendant Burdick is not independent pursuant to NYSE rules.

76.     Defendant Burdick served as a director of the Company during the Relevant Time Period. As a director, Defendant Burdick had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Burdick was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

77.     Defendant Burdick failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Centene's controls, Defendant Burdick failed to protect corporate assets.

78.     According to the 2025 Proxy, Defendant Burdick received $423,234 in compensation in connection with his role as a Company director. Accordingly, Defendant Burdick cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

### D.     Demand is Excused as to Defendant Coughlin

79.     Defendant Coughlin served as a director of the Company during the Relevant Time Period. As a director, Defendant Coughlin had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Coughlin was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

80.     Defendant Coughlin failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Centene's controls, Defendant Coughlin failed to protect corporate assets.

81.     According to the 2025 Proxy, Defendant Coughlin received $369,969 in compensation in connection with his role as a Company director. Defendant Coughlin is not otherwise employed and does not sit on any other company's board of directors. Accordingly, Defendant Coughlin cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

82.     Defendant Coughlin served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing financial information and earnings guidance provided to investors and analysts, as well as earnings press releases. The Audit

Committee was thus responsible for reviewing the press releases issued during the Relevant Time Period. Defendant Coughlin was thus responsible for knowingly or recklessly allowing the improper statements related to the true state of the Company's enrollment and morbidity rates, as well as retention rates in Centene's Medicare business, which were not as positive as the Company falsely represented.

### E.    Demand is Excused as to Defendant Dallas

83.    Defendant Dallas served as a director of the Company during the Relevant Time Period. As a director, Defendant Dallas had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Dallas was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

84.    Defendant Dallas failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Centene's controls, Defendant Dallas failed to protect corporate assets.

85.    According to the 2025 Proxy, Defendant Dallas received $349,969 in compensation in connection with his role as a Company director. Accordingly, Defendant Dallas cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

86.    Defendant Dallas served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing financial information and earnings guidance provided to investors and analysts, as well as earnings press releases. The Audit Committee was

thus responsible for reviewing the press releases issued during the Relevant Time Period. Defendant Dallas was thus responsible for knowingly or recklessly allowing the improper statements related to the true state of the Company's enrollment and morbidity rates, as well as retention rates in Centene's Medicare business, which were not as positive as the Company falsely represented.

**F.    Demand is Excused as to Defendant DeVeydt**

87.    Defendant DeVeydt served as a director of the Company during the Relevant Time Period. As a director, Defendant DeVeydt had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant DeVeydt was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

88.    Defendant DeVeydt failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Centene's controls, Defendant DeVeydt failed to protect corporate assets.

89.    According to the 2025 Proxy, Defendant DeVeydt received $379,969 in compensation in connection with his role as a Company director. Accordingly, Defendant DeVeydt cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

90.    Defendant DeVeydt served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing financial information and earnings guidance provided to investors and analysts, as well as earnings press releases. The Audit

Committee was thus responsible for reviewing the press releases issued during the Relevant Time Period. Defendant DeVeydt was thus responsible for knowingly or recklessly allowing the improper statements related to the true state of the Company's enrollment and morbidity rates, as well as retention rates in Centene's Medicare business, which were not as positive as the Company falsely represented.

### G.    Demand is Excused as to Defendant Eppinger

91.    Defendant Eppinger served as a director of the Company during the Relevant Time Period. As a director, Defendant Eppinger had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Eppinger was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

92.    Defendant Eppinger failed to conduct oversight of the Company's internal controls over financial reporting,  or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Centene's controls, Defendant Eppinger failed to protect corporate assets.

93.    According to the 2025 Proxy, Defendant Eppinger received $590,026 in compensation in connection with his role as a Company director. Accordingly, Defendant Eppinger cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

### H.    Demand is Excused as to Defendant Ford

94.    Defendant Ford served as a director of the Company during the Relevant Time Period. As a director, Defendant Ford had a duty to ensure that the Company's SEC filings, press

releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Ford was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

95.    Defendant Ford failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Centene's controls, Defendant Ford failed to protect corporate assets.

96.    According to the 2025 Proxy, Defendant Ford received $349,969 in compensation in connection with his role as a Company director. Accordingly, Defendant Ford cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

**I.    Demand is Excused as to Defendant Greco**

97.    Defendant Greco served as a director of the Company during the Relevant Time Period. As a director, Defendant Greco had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Greco was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

98.    Defendant Greco failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Centene's controls, Defendant Greco failed to protect corporate assets.

99.    According to the 2025 Proxy, Defendant Greco received $234,857 in compensation in connection with his role as a Company director. Defendant Greco is not otherwise employed. Accordingly, Defendant Greco cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

**J.    Demand is Excused as to Defendant Samuels**

100.    Defendant Samuels served as a director of the Company during the Relevant Time Period. As a director, Defendant Samuels had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Samuels was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

101.    Defendant Samuels failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Centene's controls, Defendant Samuels failed to protect corporate assets.

102.    According to the 2025 Proxy, Defendant Samuels received $349,969 in compensation in connection with his role as a Company director. Defendant Samuels is not otherwise employed. Accordingly, Defendant Samuels cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

**K.    Demand is Excused as to Defendant Tanji**

103.    Defendant Tanji served as a director of the Company during the Relevant Time Period. As a director, Defendant Tanji had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations,

prospects, internal controls, and financial statements were accurate. Defendant Tanji was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

104. Defendant Tanji failed to conduct oversight of the Company's internal controls over financial reporting, or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Centene's controls, Defendant Tanji failed to protect corporate assets.

105. Defendant Tanji served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing financial information and earnings guidance provided to investors and analysts, as well as earnings press releases. The Audit Committee was thus responsible for reviewing the press releases issued during the Relevant Time Period. Defendant Tanji was thus responsible for knowingly or recklessly allowing the improper statements related to the true state of the Company's enrollment and morbidity rates, as well as retention rates in Centene's Medicare business, which were not as positive as the Company falsely represented.

106. Based on the facts alleged herein, there is a substantial likelihood that Plaintiff will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

### CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

107. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

108.    Each of the Defendants owed and owes Centene the highest obligations of loyalty, good faith, due care, and oversight.

109.    Each of the Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

110.    The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

111.    In addition, the Director Defendants further breached their fiduciary duties owed to Centene by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose the true state of the Company's enrollment and morbidity rates, as well as retention rates in Centene's Medicare business, which were not as positive as the Company falsely represented.

112.    The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

113.    The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to

improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

114. As a direct and proximate result of the breaches of duty alleged herein, Centene has sustained and will sustain significant damages.

115. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

116. Plaintiff, on behalf of Centene, has no adequate remedy at law.

### COUNT II
### Breach of Fiduciary Duty
### (Derivatively Against the Officer Defendants)

117. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

118. The Officer Defendants are executive officers of the Company. As executive officers, The Officer Defendants owed and owe Centene the highest obligations of loyalty, good faith, due care, oversight, and candor.

119. The Officer Defendants breached their fiduciary duties owed to Centene by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose the true state of the Company's enrollment and morbidity rates, as well as retention rates in Centene's Medicare business, which were not as positive as the Company falsely represented.

120.    The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

121.    As a direct and proximate result of the breaches of duty alleged herein, Centene has sustained and will sustain significant damages.

122.    As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

123.    Plaintiff, on behalf of Centene, has no adequate remedy at law.

**COUNT III**
**Gross Mismanagement**
**(Against All Defendants)**

124.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

125.    By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

126.    As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

127.    As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, Centene has sustained and will sustain significant damages.

128.    As a result of the misconduct alleged herein, the Defendants are liable to the Company.

129.    Plaintiff, on behalf of Centene, has no adequate remedy at law.

## COUNT IV
## Waste of Corporate Assets
## (Derivatively Against All Defendants)

130.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

131.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

132.    As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

133.    As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, Centene has sustained significant damages.

134.    As a result of the misconduct alleged herein, the Defendants are liable to the Company.

135.    Plaintiff, on behalf of Centene, has no adequate remedy at law.

## COUNT V
## Unjust Enrichment
## (Derivatively Against the Officer Defendants)

136.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

137.    By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Officer Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

138.    The Officer Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

139.    Plaintiff, on behalf of Centene, seeks restitution from the Officer Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by the Officer Defendants due to their wrongful conduct and breach of their fiduciary duties.

**COUNT VI**
**Violation of Section 14(a) of the Exchange Act**
**(Against The Director Defendants)**

140.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

141.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

142.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2025 Proxy. In the 2025 Proxy, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

143.    The 2025 Proxy, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Centene misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

144.    Plaintiff, on behalf of Centene, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper reelection of the Director Defendants to the Board.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Centene and that Plaintiff is a proper and adequate representative of the Company;

B.      Against all of the Defendants and in favor of Centene for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C.      Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.      Awarding Centene restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: July 31, 2025                    **ROWLEY LAW PLLC**


*S/ Shane T. Rowley*
Shane T. Rowley (SR-0740)
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
Email: drl@rowleylawpllc.com

*Attorneys for Plaintiff*